**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| GEICO INDEMNITY COMPANY | : | |
|     Plaintiff, | : | |
| | : | **CIVIL ACTION NO.** |
| v. | : | **3:12-cv-01137 (VLB)** |
| | : | |
| | : | **January 6, 2016** |
| GREGORY DIONISIO, | : | |
| JANET MCCALL FLEMING, | : | |
| INDIVIDUALLY AND AS | : | |
| ADMINISTRATRIX OF THE ESTATE | : | |
| OF THOMAS C. FLEMING, | : | |
|     Defendants. | : | |

<u>**MEMORANDUM OF DECISION GRANTING PLAINTIFF GEICO INDEMNITY**</u>
<u>**COMPANY'S MOTION FOR SUMMARY JUDGMENT [Dkt. #45]**</u>

      Plaintiff, GEICO Indemnity Company ("GEICO"), brings this action for a

declaratory judgment against Defendants Gregory Dionisio ("Dionisio") and Janet

McCall Fleming ("Fleming"), in both her individual capacity and as administratrix

of the estate of Thomas C. Fleming.  This dispute arises out of a fatal motor

vehicle accident which occurred in the morning hours of July 5, 2009, when

Dionisio, while driving his father's automobile under the influence, struck and

killed Thomas Fleming.  Dionisio subsequently was prosecuted, convicted and

imprisoned.  Currently before the Court is the Plaintiff's motion for summary

judgment.  The motion seeks an order declaring that Dionisio is not an insured

under a family automobile policy the Plaintiff issued to Dionisio's mother,

Maryann Dionisio ("Ms. Dionisio"), who at the time of the accident resided at 221

Catalpa Road, in Wilton, Connecticut (the "Insured's House").  For the reasons

that follow, the Plaintiff's motion is GRANTED.

1

I.   <u>Factual Background</u>

From 2006 to May 31, 2009, Ms. Dionisio resided in an apartment in New Canaan, Connecticut, and rented the House to tenants.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 20, 22; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 20, 22].  On June 1, 2009, Ms. Dionisio resumed occupancy of the House.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 20; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 20].

Ms. Dionisio's son, Defendant Gregory Dionisio, resided at the House while he was in high school, from which he graduated in 2006.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 16, 23; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 16, 23].  However, Ms. Dionisio ordered her son to leave the House when he turned eighteen years old, because he failed to follow house rules and was a bad influence on his sister.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 24, 26; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 24, 26].[1]  After ejecting the Defendant from the House, Ms. Dionisio helped her son secure an apartment in Norwalk, Connecticut, where the Defendant lived with some friends.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 25; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 25; Dkt. #45-10, Ex. G to Pl.'s Mot. at 31:11-21].  From that point on, the Defendant was "on his own," aside from a single instance in which his mother acted as a cosigner on a transaction, and his practice of occasionally directing mail to the House.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 27; Dkt. #52-1,

---

[1] At all relevant times, Defendant Dionisio's sister resided with her mother, including at the time of the collision.  [Dkt. #45-10, Ex. G to Pl.'s Mot. at 25:9-15, 49:24-50:1].  Conversely, Defendant Dionisio's brother lived with his father, in Mamaroneck, New York.  [*Id.* at 14:23-15:4, 49:24-50:2].

Def. Fleming's Rule 56(a)(2) Statement at ¶ 27; Dkt. #45-10, Ex. G to Pl.'s Mot. at 62:25-63:2].[2]

After graduating high school, Defendant Dionisio enrolled in college in the state of Colorado, but while there, he was arrested and expelled from the school. [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 28-29; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 28-29]. Defendant Dionisio then returned to Connecticut, but not the House; instead, he resided with his grandmother for one-and-a-half years, in a home in Norwalk, Connecticut, which was also owned by Ms. Dionisio. [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 30; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 30]. Relying on deposition testimony from the Defendant and his mother, Plaintiff contends that the Defendant moved out of his grandmother's home and into a cottage located behind the home of his landlord, with two housemates he found on the website craigslist.org ("Craigslist"). [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 31; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 31; Dkt. #45-11, Ex. H to Pl.'s Mot. at 23:9-11]. The three housemates each had their own room. [Dkt. #45-11, Ex. H to Pl.'s Mot. at 23:20-21]. Defendant Fleming appears to agree that Defendant Dionisio moved to Stamford. [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 33; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 33].[3] The parties dispute the length of

---

[2] Indeed, Ms. Dionisio testified that while she always registered her daughter's cars on her own insurance policy and paid for her insurance, Defendant Dionisio was not on her policy. [Dkt. #45-10, Ex. G to Pl.'s Mot. at 62:21-23].

[3] However, Defendant Fleming emphasizes that, when asked at his deposition, Defendant Dionisio could not recall the names of the two housemates he lived with or the exact address of the Stamford cottage, and that he gave arguably conflicting testimony regarding the length of time he resided at the cottage. *See*

time Defendant Dionisio resided in Stamford, but the testimony offered by the Defendant and his mother indicates that he lived there for at least several months, and for no more than one year.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 31, 35; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 31, 35; Dkt. #52-1, Statement of Disputed Issues, at ¶ 1].

While Defendant Dionisio was living in Stamford, he did not see his family often, and his mother visited the cottage just once.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 32-33; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 32-33; Dkt. #45-10, Ex. G to Pl.'s Mot. at 30:6-13].  His sister never visited the cottage. [Dkt. #45-11, Ex. H to Pl.'s Mot. at 26:20-22].  While living in Stamford, Defendant Dionisio was the executive chef of a restaurant, where he routinely worked fifteen hours per day.  [Dkt. #45-11, Ex. H to Pl.'s Mot. at 27:10, 33:9-14].[4]

On Friday, July 3, 2009, the day before the July 4th holiday weekend, Defendant Dionisio discovered that some of his belongings were missing, argued with his roommates over the missing items, and left the cottage, taking with him approximately 90% of his personal belongings.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 35; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 35; Dkt. #52-1, Statement of Disputed Issues, at ¶ 4].  After leaving the cottage, Defendant Dionisio took his personal belongings to the House, and stored them in the

---

[Dkt. #45-11, Ex. H to Pl.'s Mot. at 22:23-23:4, 26:14-27:3, 73:18-21; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 31, 39-41; Dkt. #52-1, Statement of Disputed Issues, at ¶¶ 1, 3].

[4] Defendant Dionisio worked at the restaurant for a total of approximately one-and-a-half years.  *See* [Dkt. #45-11, Ex. H to Pl.'s Mot. at 27:11-14].  He'd received some formal training in cooking and had been cooking "for a long time."  [*Id.* at 27:15-18].

garage.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 36; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 36; Dkt. #52-1, Statement of Disputed Issues, at ¶ 6; Dkt. #45-10, Ex. G to Pl.'s Mot. at 40:23-41:1].  Defendant Dionisio also left some large pieces of furniture, such as dressers, at the cottage.  [Dkt. #45-11, Ex. H to Pl.'s Mot. at 28:16-22].  In addition, the Defendant testified that at the time he moved his personal items into his mother's garage, he was actively looking for a new place to live.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 36; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 36; Dkt. #52-1, Statement of Disputed Issues, at ¶ 6; Dkt. #45-10, Ex. G to Pl.'s Mot. at 41:2-5, 15-16].[5]

Defendant Dionisio went to work on July 3, and afterward, he returned to his mother's home, in the early morning hours of July 4, 2009.  [Dkt. #45-11, Ex. H to Pl.'s Mot. at 40:12-19].  After returning to the House, the Defendant consumed some alcohol and drugs, but he believed he took the latter in his car because his "[m]om didn't allow drugs in the house."  [*Id.* at 41:24-42:13].  The Defendant slept over the house that night, but by 9:00 AM on July 4, he had already left for work, where he stayed until around midnight, and returned to the House thereafter.  [*Id.* at 33:4-14, 34:10-14; Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶

---

[5] Specifically, Defendant Dionisio testified that his "intentions were to find another apartment and move out, but things changed quickly."  [Dkt. #45-11, Ex. H to Pl.'s Mot. at 22:21-22].  Defendant Dionisio further testified that at the time he returned to his mother's home, but before the collision, he "[a]bsolutely" had a goal, aspiration, or plan to move out of the House and find another apartment, and that he had already started looking at newspaper ads for a new place to live.  [*Id.* at 71:22-72:15].  His mother concurred, testifying that at the time he moved out of his Stamford cottage, he already "was looking for another place . . . [H]e was definitely looking for another place.  He was pretty upset."  [Dkt. #45-10, Ex. G to Pl.'s Mot. at 40:13-22].

41-42; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 41-42].[6]  At the House, the Defendant consumed six to eight beers, and at 3:00 AM, he left to go to a friend's house.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 42-43; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 42-43].

Later that morning, at approximately 7:30 AM, Defendant Dionisio was involved in a fatal car collision, which killed Thomas Fleming.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 1; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 1; Dkt. #52-1, Statement of Disputed Issues, at ¶ 14; Dkt. #45-11, Ex. H to Pl.'s Mot. at 37:13-16].  The Defendant had no memory of his intended destination at the time of the collision, but testified that he was on a route that could have taken him "back home" to 221 Catalpa Road.  [Dkt. #45-11, Ex. H to Pl.'s Mot. at 44:18-20, 45:4-6; Dkt. #52-1, Statement of Disputed Issues, at ¶ 15].  Following the collision, Defendant Dionisio pled guilty to vehicular manslaughter and illegal operation of a motor vehicle while under the influence, and was sentenced to ten years in prison, suspended after five years served.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 48; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 48].

While the Defendant testified that he slept at the home from July 3 to July 4, 2009, his mother testified that he was not staying with her and she did not know where he was staying at that time.  [Dkt. #45-10, Ex. G to Pl.'s Mot. at 41:18-21; Dkt. #45-11, Ex. H to Pl.'s Mot. at 71:25-72:2].  Although she acknowledged the Defendant was "probably" at her home at some point during the holiday

---

[6] Specifically, Defendant Dionisio testified that, at the end of his July 4 work day, he "went home" to 221 Catalpa Road.  [Dkt. #45-11, Ex. H to Pl.'s Mot. at 34:12-14].

weekend.  [Dkt. #45-10, Ex. G to Pl.'s Mot. at 42:17-18].  Some of her uncertainty

stemmed from her belief that she was at her boyfriend's home in Lake Peekskill,

New York, during some of that weekend, and not at the House.  [*Id.* at 55:23-56:2].

She further testified that her three adult children, including the Defendant, had

keys to the House, which permitted them to "come and go as they please[d]."

[Dkt. #45-10, Ex. G to Pl.'s Mot. at 42:20-22].[7]

---

[7] **Defendant Fleming attaches to her Opposition three sets of documents prepared by members of the Wilton Police Department that list Defendant Dionisio's address or residence as 221 Catalpa Road: (i) an accident report prepared by the officer who arrived on the scene; (ii) an arrest warrant affidavit prepared by an officer at the scene; and (iii) toxicology reports.  *See* [Dkt. #52-2, Exs. E-G to Cooper Aff.].  The portions of those documents listing the address constitute inadmissible hearsay within hearsay, and, in offering them, Defendant Fleming fails to identify any potentially applicable exception.  *See* Fed. R. Evid. 805. Indeed, Defendant Fleming has made no attempt to address the admissibility of these and other documents addressed in note 9 of this Opinion despite receiving a reply brief from Plaintiff GEICO which directly challenged their admissibility.  *See* [Dkt. #53, Pl.'s Reply at 1-4].  After carefully reviewing each of these three groups of documents, the Court finds that none of them are admissible.  As for the accident report prepared by the police officer who arrived on the scene, *see* [Dkt. #52-2, Ex. E to Cooper Aff.], even if the report itself fell within the business records exception, the listing of the Defendant's address still would not be admissible, because there is no evidence that, in preparing the report, the officer had personal knowledge of the Defendant's address.  *See* Fed. R. Evid. 803(6); *see also Rodriguez v. Modern Handling Equip. of NJ, Inc.*, 604 F. Supp. 2d 612, 622-23 (S.D.N.Y. 2009) ("Inadmissible hearsay does not become admissible solely by virtue of its inclusion in an admissible report.") (excluding written portion of report that fell within business records exception where drafter did not have personal knowledge of the information).  For the same reasons, the portion of the arrest warrant affidavit listing the Defendant's "residence" is inadmissible.  [Dkt. #52-2, Ex. F to Cooper Aff.].  While the document does contain a lengthy averment by the officer under oath, the sworn statement appears *below* the heading, "Affidavit," and immediately follows the phrase, "The undersigned affiant, being duly sworn, deposes and says . . . ."  [*Id.*].  By contrast, the portion of the document listing Defendant Dionisio's residence sits *above* the "Affidavit" heading.  Thus, it is clear from the face of the document that the officer was *not* attesting to the Defendant's address, but only to the information in the fifteen numbered paragraphs comprising the "Affidavit" section, none of which concerned where the Defendant resided at the time of the accident.  [*Id.*].  There is nothing to**

On October 20, 2009, Defendant Fleming, the wife of the decedent, filed suit in Connecticut Superior Court against Defendant Dionisio and his father, non-party John Dionisio, who was the owner of the vehicle which struck and killed Mr. Fleming (the "Connecticut Suit"). [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 2; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 2]. Plaintiff GEICO was not a party to this suit. *See* [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 1-2; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 1-2].[8]

---

indicate who put the Defendant's address on the affidavit, and, more importantly, where they obtained it. Finally, the toxicology reports themselves may fall within the business records exception, and statements contained in them relating to the Defendant's medical diagnosis or treatment, such as his medical history, past or present symptoms or sensations, their inception, or their general cause, may be admissible under Rule 803(4). [*Id.* at Ex. G]. However, the mere listing of the Defendant's purported address is not admissible, as there is no evidence that the individuals who prepared the reports had actual knowledge of the address when they prepared them. Nor is there any indication where that information came from. Accordingly, the Court does not consider these three groups of documents in resolving the Plaintiff's motion. *Ozanne v. Univ. of Connecticut Health Care*, 292 F. Supp. 2d 425, 434 (D. Conn. 2003) ("The court cannot consider hearsay statements in opposition to a motion for summary judgment.") (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)).

[8] Defendant Fleming also invites the Court to consider statements made in connection with the Connecticut Suit, including testimony taken from Defendant Dionisio and portions of a brief prepared and submitted by his counsel on appeal. *See* [Dkt. #52-2, Exs. A, C to Cooper Aff.]. These materials, like those from the Wilton Police Department, constitute inadmissible hearsay, and no exception appears to apply. For instance, Defendant Dionisio's testimony does not constitute former testimony within the meaning of Federal Rule of Evidence 804(b)(1) because Plaintiff GEICO was not a party to that litigation, and thus, it did not have the opportunity to examine the witness. Fed. R. Evid. 804(b)(1)(B); *see also Ayazi v. United Fed'n of Teachers, Local 2*, No. 99 CV 8222 (CLP), 2011 WL 4753519, at *13 (E.D.N.Y. Oct. 7, 2011) (declining to consider deposition testimony on summary judgment where moving defendant "was never afforded an opportunity to examine" the witness). As for the statements in Defendant Dionisio's brief, while they may be admissible against *Defendant Dionisio*, under Rule 801(d)(2), here, Defendant Fleming seeks to use them against *Plaintiff GEICO*. The declarant, Defendant Dionisio, has not entered an

The Dionisios held several policies issued by Plaintiff GEICO: (i) a policy with a liability limit of $300,000 issued to John Dionisio; (ii) a policy with a liability limit of $1 million issued to John Dionisio; (iii) a policy issued to Gregory Dionisio with a $20,000 bodily injury liability for each person /$40,000 per occurrence; and (iv) a family auto insurance policy with a $250,000 bodily injury liability per person/$500,000 per occurrence issued to Maryann Dionisio (the "Family Policy"). [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 3-5; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 3-5]. At issue in the present case, is the Family Policy. Under the terms of the Family Policy, coverage was extended to the insured and any "relative," defined as any "person related to [the insured] who resides in [the insured's] household with [the insured]." [Dkt. #45-9, Ex. F to Pl.'s Mot. at 6, ¶ 8]. At all times, Plaintiff GEICO has maintained that Defendant Dionisio did not qualify as an insured under the Family Policy. [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 6; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 6].

On August 2, 2012, Defendant Fleming and John Dionisio reached a settlement, whereby John Dionisio agreed to pay Fleming $1.3 million in exchange for a full release from liability. [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 9; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 9]. The agreement also provided GEICO with a limited release of liability, as to those policies GEICO had issued to John Dionisio. [*Id.*]. The suit against the remaining defendant, Gregory Dionisio, went to trial, and on April 11, 2013, the jury returned a verdict for Fleming, in the amount of $2,517,695.56. [Dkt. #45-1, Pl.'s Rule 56(a)(1)

---

appearance in this case and has not opposed the Plaintiff's motion for summary judgment. Accordingly, the Court does not consider the testimony and statements from the Connecticut Suit in resolving the Plaintiff's motion.

Statement at ¶ 10; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 10].
However, the judgment entered by the court, which took into account the
separate settlement reached with John Dionisio, consisted of statutory and
common law punitive/exemplary damages totaling $1,550,084.87, and damages
for negligence totaling just $2.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 13;
Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 13].

The parties agree that *none* of the policies issued by GEICO provide
coverage for statutory or common law punitive damages.  [Dkt. #45-1, Pl.'s Rule
56(a)(1) Statement at ¶ 14; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶
14].  In her Opposition, Defendant Fleming further concedes that "coverage is not
available under the [Family] Policy for judgments based on reckless conduct . . .
."  [Dkt. #52, Def.'s Opp. at 9]; *see also* [Dkt. #45-9, Ex. F to Pl.'s Mot. at 4, ¶ 2].
Accordingly, the sole live issue between the parties is whether Defendant
Dionisio was a "relative" of the insured, Maryanne Dionisio, under the terms of
the Family Policy at the time of the collision.

## II.  <u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is
no genuine dispute as to any material fact and the movant is entitled to judgment
as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of
proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98,
106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is
required to resolve all ambiguities and credit all factual inferences that could be
drawn in favor of the party against whom summary judgment is sought."  *Id.*

(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).  In addition, determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment, as such are within the sole province of the jury.  *Hayes v. New York City Dep't of Corr.,* 84 F. 3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No. 3:03-cv-481 (MRK), 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (citing and quoting *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions

without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

**III.**   **Analysis**

**A.**   **Defendant Dionisio Did Not Reside in the Insured's Home**

In the insurance context, the Connecticut Supreme Court has identified nine factors a court must consider in determining where an individual resides:

> [T]he intent of the individual; the frequency of contact between the individual and other household inhabitants; the frequency with which the individual spends time at the household; the maintenance of a separate residence for the individual; whether the individual is emotionally and financially capable of establishing and maintaining a residence independent of the household; the location of personal belongings; the location of and address used for personnel and business records; the address at which mail is received; and the address used for formal purposes such as voting, licenses, and income tax filings.

*Remington v. Aetna Cas. & Sur. Co.*, 240 Conn. 309, 315, 692 A.2d 399, 402 (Conn. 1997).

While these factors must be considered, they are not exhaustive, and "in each case, the decision has depended upon the particular factual circumstances involved."  *Griffith v. Security Ins. Co.*, 167 Conn. 450, 459, 356 A.2d 94, 97 (Conn. 1975).  Here, considering all of the admissible evidence in the record, the Court finds that no reasonably jury could conclude that Defendant Dionisio was a "relative" of Ms. Dionisio under the terms of the Family Policy at the time of the collision.

**1.**   **Defendant Dionisio's Intent**

Turning to the first factor, the undisputed record establishes that Defendant Dionisio's intent in moving most of his belongings and sleeping at the

home for one night was not to re-establish residency there, but to store his belongings and stay there temporarily while actively searching for a new living arrangement. [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 36; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 36; Dkt. #52-1, Statement of Disputed Issues, at ¶ 6; Dkt. #45-10, Ex. G to Pl.'s Mot. at 40:23-41:1].  From the outset, his conduct indicates that he did not intend to reside at the House. The Defendant did not move all of his belongings there.  He left large furnishings at the cottage that he was renting with the roommates with whom he argued. [Dkt. #45-11, Ex. H to Pl.'s Mot. at 28:16-22]. Dionisio brought smaller personal items to the House and did not move them into the residential portion of the home.  Instead, he stored these belongings in the garage.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 36; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 36; Dkt. #45-10, Ex. G to Pl.'s Mot. at 40:23-41:1].

Consistent with these actions, the Defendant subsequently admitted he never intended to reside at the House.  He testified at his deposition that his "intentions were to find another apartment and move out," that prior to the collision, he "[a]bsolutely" had a goal, aspiration, or plan to move out of the house and find another apartment, and that he was already looking for a new place to live.  [Dkt. #45-11, Ex. H to Pl.'s Mot. at 22:21-22, 71:22-72:15].  His mother concurred, testifying that at the time he moved out of his Stamford cottage, he already "was looking for another place . . . [H]e was definitely looking for another place.  He was pretty upset."  [Dkt. #45-10, Ex. G to Pl.'s Mot. at 40:13-22].  This stated intention is buttressed by additional evidence in the record, including that

the Defendant had been ordered to leave the House at age eighteen and had never been invited back to live there.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 24, 26; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 24, 26].  In fact, Ms. Dionisio helped find him a new place to live and provided him with a security deposit so that he could move out.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 25; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 25; Dkt. #45-10, Ex. G to Pl.'s Mot. at 31:11-21].  This was, in part, because the Defendant's mother feared that he would be a bad influence on his younger sister, who continued to live with his mother in the House up through the time of the collision.  [Dkt. #45-10, Ex. G to Pl.'s Mot. at 49:24-50:1].  Moreover, after returning to Connecticut following his arrest and expulsion from college, the Defendant lived away from home for years, including one-and-a-half years with a different family member, his grandmother, in a different home that his mother owned.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 30; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 30]. Finally, the Defendant testified to having taken specific steps to locate a new living space after moving his belongings out of the Stamford cottage, including searching newspaper ads.  [Dkt. #45-11, Ex. H to Pl.'s Mot. at 71:22-72:15].

        In response to the Plaintiff's evidence of intent, Defendant Fleming offers a few stray statements from Defendant Dionisio's deposition in which he referred to his mother's residence as "home" or "the house."  *See* [Dkt. #52, Def.'s Opp. at 6-7; Dkt. #45-11, Ex. H to Pl.'s Mot. at 34:12-14 (stating that after work on July 4, 2009, he "went home" to 221 Catalpa Road); 41:24-42:13 (stating that his "[m]om didn't allow drugs in the house"); 45:4-6 (stating that the route he was taking at

the time he struck and killed Thomas Fleming "could have taken me back home")].  None of these remarks undercuts the stated intention and substantial evidence supporting that intention discussed above.  The phrases "went home" or "back home" say nothing about *whose* home the Defendant was speaking of, his own present home, his mother's home, or his childhood home.  Indeed, elsewhere, he referred to the residence as his "mom's house."  [Dkt. #45-11, Ex. H to Pl.'s Mot. at 63:21].  Even if Dionisio meant the House when he used the term "home," the use of that term is not indicative of his intent, because it is customary for adults to refer to their childhood home as "home" although they do not reside there and have no intent to ever reside there again.

## 2.    Infrequent Contact With the Occupants of the House

The second factor, the frequency of contact between the individual and other household inhabitants, also weighs strongly in favor of non-residency.  The uncontroverted record establishes that Defendant Dionisio had limited and infrequent contact with both his mother and sister, who resided in the House, for several years.  After moving out of the House when he turned eighteen years old, the Defendant's mother testified that, going forward, the Defendant was "on his own," aside from a single instance in which his mother acted as a cosigner on a transaction, and his practice of occasionally directing mail to the home.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 24, 26-27; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 24, 26-27; Dkt. #45-10, Ex. G to Pl.'s Mot. at 62:25-63:2].  After leaving the House, the Defendant lived in Colorado and in different towns in Connecticut from where his mother and sister lived.  [Dkt. #45-1, Pl.'s Rule

56(a)(1) Statement at ¶¶ 28-31; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 28-31]. While living in Stamford, Connecticut, with the two housemates he found on Craigslist just before he returned to the House, Defendant Dionisio did not see his family often; his mother visited the cottage just once, and his sister never did. [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 32-33; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 32-33; Dkt. #45-10, Ex. G to Pl.'s Mot. at 30:6-13; Dkt. #45-11, Ex. H to Pl.'s Mot. at 26:20-22]. Finally, during the two days the Defendant was at the home, the record indicates he had little to no contact with either his sister or mother, who testified that she was away from the House for considerable periods of time that weekend. [Dkt. #45-10, Ex. G to Pl.'s Mot. at 55:23-56:2]. Indeed, Defendant Fleming appears to concede this factor. *See* [Dkt. #52, Def.'s Opp. at 11 ("[I]t does not appear that [Ms. Dionisio] and her son had frequent contact in the prior months.")].

3.   Infrequent Presence at the House

Third, there is no evidence in the record that the Defendant spent any meaningful time at the House prior to his two-day return over the holiday weekend. The Defendant was ordered to leave the House when he turned eighteen, and there is no indication that he returned at any time over the three year period in which he was living away from it. In fact, the Defendant's mother testified that Defendant Dionisio left her "house when he was 18 [years old] and never came back." [Dkt. #45-10, Ex. G to Pl.'s Mot. at 17:15-16].

Even during the period in question, July 3 through the early morning hours of July 5, 2009, Dionisio's conduct indicated that he did not intend to reside at the

16

House, as he spent little time there during his brief stay.  On July 3, the day he returned to the House, Dionisio moved his belongings into the garage and then went to work, until midnight.  [Dkt. #45-11, Ex. H to Pl.'s Mot. at 40:12-19].  After returning to the House, he consumed some alcohol and drugs, but he believed he took the latter in his car, because his "[m]om didn't allow drugs in the house." [*Id.* at 41:24-42:13].  He spent the night at the House, but that was the only night he slept there.  By 9:00 AM the next morning, July 4, the Defendant had already left for work, and again worked until midnight.  [*Id.* at 33:4-14, 34:10-14; Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 41-42; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 41-42].  After returning to the House, he spent no more than three hours there, since at 3:00 AM on July 5, he left to go to a friend's house.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 42-43; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 42-43].  There is no evidence that he returned to the House at any point prior to the accident.  Indeed, he testified that he did not know where he was going at 7:30 AM on July 5, when the accident occurred.  [Dkt. #45-11, Ex. H to Pl.'s Mot. at 44:18-20].

   4. <u>Maintenance of a Separate Residence</u>

   Fourth, from the time Defendant Dionisio was ordered to leave the House, three years before the accident, to July 3, 2009, two days prior, the Defendant maintained a separate residence.  Upon leaving the House in 2006, he moved into an apartment in Norwalk, Connecticut, with some friends.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 25; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 25; Dkt. #45-10, Ex. G to Pl.'s Mot. at 31:11-21].  Then, he enrolled in college in

Colorado.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 28; Dkt. #52-1, Def.
Fleming's Rule 56(a)(2) Statement at ¶ 28].  After he was expelled, he returned to
Connecticut, and for one-and-a-half years, he lived with his grandmother, at her
home in Norwalk.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 30; Dkt. #52-1,
Def. Fleming's Rule 56(a)(2) Statement at ¶ 30].  He then moved out of his
grandmother's home and into a cottage with two housemates in Stamford.  [Dkt.
#45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 31; Dkt. #52-1, Def. Fleming's Rule 56(a)(2)
Statement at ¶ 31].

Defendant Fleming attempts to discredit testimony regarding Defendant
Dionisio's move to the cottage by pointing out that, at his deposition, Defendant
Dionisio could not recall the names of the two housemates he lived with or the
exact address of the Stamford cottage, and that he offered arguably inconsistent
testimony regarding the amount of time he lived there. *See* [Dkt. #52, Def.'s Opp.
at 14, n. 2].  However, even if the Court were to agree with Defendant Fleming that
this testimony calls into doubt the Defendant's story, at most, this tends to show
that the Defendant was not living with roommates in Stamford; it does not touch
upon the material issue of whether at any time prior to the July 4th holiday
weekend he was living at his mother's home in Wilton, Connecticut.  Indeed, in
the one-and-a-half years immediately preceding his move to Stamford, the
Defendant was living with his grandmother, in Norwalk, and had not lived in the
House for a period of years.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 30; Dkt.
#52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 30].

In addition, given that the Defendant found his housemates over the internet, they lived in a cottage behind the home of their landlord, they each had their own room, they lived together for no more than one year, and during that time, the Defendant was working 15 hours per day as an executive chef at a restaurant, it is not inconceivable that the Defendant could not recall his housemate's names and the exact address of the cottage during his deposition. [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 31, 35; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 31, 35; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 31, 35; Dkt. #52-1, Statement of Disputed Issues, at ¶ 1; Dkt. #45-11, Ex. H to Pl.'s Mot. at 23:9-11, 23:20-21, 27:10, 33:9-19].  Similarly, the arguably inconsistent testimony offered by the Defendant regarding the amount of time he lived there, first stating that it was "[s]ix to eight months," and later, "[a]bout a year . . . Between six months to a year," is hardly remarkable.  [Dkt. #45-11, Ex. H to Pl.'s Mot. at 22:23-23:4, 73:18-21].  The initial timeframe he identified falls entirely within the second one, and is consistent with his characterization of the period as constituting the greater part of a year.

Defendant Fleming contends that from July 3 through July 5, 2009, Defendant Dionisio "had no separate residence."  [Dkt. #52, Def,'s Opp. at 11]. While Defendant Dionisio testified that he moved out of the Stamford cottage on July 3, *see* [Dkt. #45-11, Ex. H to Pl.'s Mot. at 28:4-10], in the context of this case, this fact is hardly probative of the core issue, whether he resided at his mother's home during this period of time.  This is because the sequence of events makes clear that, at the time the Defendant hastily moved most (but not all) of his

belongings out of the cottage and into his mother's garage, he lacked any residence.  Indeed, elsewhere in her brief, Defendant Fleming cites the definition of "homeless" which appears in the McKinney-Vento Act, 42 U.S.C. § 11302(a)(1).  *See* [Dkt. #52, Def.'s Opp. at 13].  While this statute is otherwise inapplicable, its definition of a "homeless individual," *i.e.*, an "individual or family who lacks a fixed, regular, and adequate nighttime residence," would appear to perfectly characterize Defendant Dionisio during his two-day, one-night stay over his mother's home, with no "fixed" or "regular" residence to which to go thereafter.  [*Id.* (quoting 42 U.S.C. § 11302(a)(1))].  Given the extremely short duration of the Defendant's stay at the House, including sleeping over just a single night, his having spent the bulk of this period away from the home, his storage of his belongings in the home's garage, and his testimony regarding his intent to leave the House, which included having taken affirmative steps in order to do so, the record does not support the conclusion that the House constituted a "fixed" or "regular" residence while he was there.

### 5.   Dionisio was Emotionally and Financially Capable of Establishing and Maintaining a Residence Independent of the House

The fifth factor, whether the individual is emotionally and financially capable of establishing and maintaining a residence independent of the household, also tilts heavily in favor of the Plaintiff.  On the one hand, Defendant Dionisio is a troubled young man with a history of substance abuse, disciplinary problems, and criminal activity.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 24, 26, 28-29, 48; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 24, 26, 28-29, 48].  Nevertheless, by the time the Defendant returned to his mother's home

on July 3, 2009, he had been living away from the House for three years, twice without any family members for support.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶¶ 25, 31; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶¶ 25, 31].  He was a skilled chef, who worked fifteen-hour days as an executive chef at a restaurant, where he worked for one-and-a-half years.  [Dkt. #45-11, Ex. H to Pl.'s Mot. at 27:10-18, 33:9-14].  After moving away from his mother's home, he received very little monetary support from her, and there is no evidence in the record that any other family members assisted him financially during that time.  [Dkt. #45-10, Ex. G to Pl.'s Mot. at 62:21-63:2].  In addition, at the time he returned to his mother's home, the Defendant intended and was actively looking to leave the home and continue living independently.  [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 36; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 36; Dkt. #52-1, Statement of Disputed Issues, at ¶ 6; Dkt. #45-10, Ex. G to Pl.'s Mot. at 40:13-22, 41:2-5, 15-16; Dkt. #45-11, Ex. H to Pl.'s Mot. at 22:21-22, 71:22-72:15].  Given the Defendant's demonstrated ability to live on his own, financial independence from his mother, and continued desire to live away from the home, the record plainly reflects that Defendant Dionsio was emotionally and financially capable of establishing and maintaining a residence independent of the House.  Defendant Fleming appears to concur.  *See* [Dkt. #52, Def.'s Opp. at 11 ("Gregory Dionisio was a 21-year-old adult . . . and capable of maintaining a residence independent of his mother's household, as he had done in the past.")].

6.    <u>Location of Dionisio's Personal Belongings</u>

The sixth factor, the location of Defendant Dionisio's personal belongings, clearly supports Defendant Fleming's position. Defendant Dionisio testified that after leaving the Stamford cottage, he brought approximately 90% of his personal belongings to his mother's home. [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 36; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 36; Dkt. #52-1, Statement of Disputed Issues, at ¶ 6]. Even so, the Defendant left these possessions in his mother's garage, while leaving some large pieces of furniture back at the cottage. Thus, none of Dionisio's belongings were in the occupied portion of the House. They were in a storage area.

7.    <u>Location of and Address Used for Personnel and Business Records</u>

The seventh factor is not relevant to this case because there is no evidence in the record which enables the court to analyze it. While he was an employee, there is no evidence that Defendant Dionisio changed his address with his employer in July of 2009. Further, Defendant Dionisio "was not engaged in a business." *USAA Prop. & Cas. Ins. Co. v. Williams*, No. 004000784S, 2006 WL 3908571, at *3 (Conn. Super. Dec. 29, 2006); *see also* [Dkt. #52, Def.'s Opp. at 11 (stating that the seventh factor is "not applicable")].

8.    <u>Address at Which Mail was Received</u>

The eighth factor tips slightly in Defendant Fleming's favor. The parties agree that Defendant Dionisio sometimes directed mail to his mother's address. [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 27; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 27; Dkt. #45-10, Ex. G to Pl.'s Mot. at 62:25-63:2]. However,

22

there is no evidence of when, how often, or for what purpose or extent he used his mother's address to receive mail.  Nor is there any evidence that he did not receive mail simultaneously at other places, such as the cottage he rented. Moreover, the evidence suggests that he used his mother's address sporadically, and not just when he was living at the House.  Thus, the use of the House as a sporadic mailing address does not indicate the Defendant's intent to live there at the time of the accident.  Finally, the infrequency with which he visited the House and saw his family members who resided there suggests that he did not regularly use that address to receive important mail.

9.    <u>Formal Mailing Address</u>

As for the last factor, the admissible evidence submitted by the parties is devoid of information regarding the address Defendant Dionisio used for formal purposes, such as voting, licenses, and income tax filings.  Defendant Fleming offers an accident report which she claims, without support, was prepared from information gathered from Defendant Dionisio's driver's license.  [Dkt. #52-2, Ex. E to Cooper Aff.; Dkt. #52-1, Statement of Disputed Issues, at ¶ 16].  As explained elsewhere, this evidence constitutes hearsay within hearsay, Defendant Fleming has failed to articulate any exception to the hearsay rule which would permit consideration of it, and the Court finds none of the exceptions are applicable. *See supra* at note 7.  Furthermore, even if the Court were to consider the contents of this document, and to accept as true Defendant Fleming's unsupported assertion that the address on the report came from and was the same as that

which appeared on Defendant Dionisio's driver's license, the report offers little to no support for Defendant Fleming's position.

The report was prepared on or around July 5, 2009, the day of the accident. *See* [*id.* at 1].  Given that Defendant Dionisio lived at his mother's home until he was eighteen years old, he was twenty-one years old at the time of the accident, and in Connecticut, driver's licenses are valid for up to six years, it is unclear whether the information on the license the policeman allegedly relied upon reflects the period of time before or after the Defendant was ordered out of the House.  *See* [Dkt. #45-1, Pl.'s Rule 56(a)(1) Statement at ¶ 24; Dkt. #52-1, Def. Fleming's Rule 56(a)(2) Statement at ¶ 24; Dkt. #45-11, Ex. H to Pl.'s Mot. at 21:23-25]; *see also* Conn. Gen. Stat. § 14-41(b) ("An original operator's license shall expire within a period not exceeding six years following the date of the operator's next birthday.").  Finally, even if this factor does weigh in favor of residency, "it does not outweigh the other cumulative factors considered."  *USAA*, 2006 WL 3908571, at *3; *see also Bonilla v. Amica Mut. Ins.*, No. 106010810S, 2011 WL 4347788, at *3 (Conn. Super. Aug. 29, 2011) (granting summary judgment to defendant insurer and finding that individual who struck and killed decedent was not a resident of insured's household even where factor two was clearly established by plaintiff).

In sum, the record plainly establishes (i) Defendant Dionisio's express intent not to reside at the House, coupled with his contemporaneous conduct consistent with that intent; (ii) very limited contact between the Defendant and his mother, sister, and the House during his years away from it and during his two-

day, one-night stay there; and (iii) the Defendant's ability to live away from the home, including holding down a demanding chef's job, with little to no financial support from his mother.  Against this evidence, Defendant Fleming offers only the facts that (i) Defendant Dionisio, like his brother who resided elsewhere, had a key to the home, (ii) he slept at the home for just one night, (iii) he moved out of his cottage the same day he moved most of his personal belongings into the garage of the House, and (iv) he sometimes directed some mail of unknown type and with unknown frequency to his mother's address.  Accordingly, the Court concludes that Defendant Fleming has not raised a genuine issue of fact as to whether Defendant Dionisio resided at the House at the time of the accident.  *See Miner v. Clinton Cnty., New York*, 541 F.3d 464, 471 (2d Cir. 2008) ("[A]n issue of fact is genuine if the evidence is such that a reasonable jury could have returned a verdict for the [defendant].").

　　None of the cases Defendant Fleming raises in support of her claim that Defendant Dionisio resided at the House compels a different conclusion.  As an initial matter, the Connecticut Supreme Court has observed that in cases where residency is in dispute, the "factual circumstances are so varied that the decisions themselves are of little precedential value."  *Griffith*, 167 Conn. at 459, 356 A.2d at 97.  In addition, none of the cases are apposite.

　　First, Defendant Fleming discusses *McCants v. State Farm Fire & Cas. Co.*, No. 106011047S, 2014 WL 660842 (Conn. Super. Ct. Jan. 24, 2014).  [Dkt. #52, Def.'s Opp. at 14-15].  In *McCants*, the plaintiff maintained a separate residence from the covered home, but she owned and often stayed there in order to "share[]

her life with family members," who frequently visited, shared meals and did one another's hair. *Id.* at *4.  Thus, the home was maintained and treated as a central place for frequent family gatherings.  By contrast, the undisputed record in this case demonstrates that throughout the relevant period, Defendant Dionisio had little contact with the House, and with his mother and his sister, even when he was staying at the home prior to the collision.

Similarly unpersuasive is *Schratwieser v. Hartford Cas. Ins. Co.*, 44 Conn. App. 754, 692 A.2d 1283 (Conn. App. 1997).  There, the Appellate Court of Connecticut reversed a grant of summary judgment in favor of the defendant insurer where the plaintiff put forth evidence that:

> [S]he frequently visited her parent's home, kept belongings there, and kept one of the bedrooms as her own, which no one else occupied and which was separate and distinct from the guest room. She also received mail there and used her parent's home as her permanent home, intending to return there some day.

*Id.* at 758.

Dionisio did not have a bedroom at the House for three years prior to the accident.  On the contrary, he was evicted at the age of eighteen and was told he could not return to live there.  His belongings were stored in the garage, not in a residential portion of the house.  Nor did he visit or use the House with any degree of regularity.  Finally, while he did have a key to the House, Ms. Dionisio testified that each of her children had keys, including Defendant Dionisio's brother, who indisputably did not reside at the home during the relevant period. [Dkt. #45-10, Ex. G to Pl.'s Mot. at 14:23-15:4, 42:20-22, 49:24-50:2].

Other than possessing a key to the House, briefly storing his belongings in a garage on a short term basis until he rented another apartment, and receiving some mail at the home, *Schratwieser* bears no resemblance to the present matter. These similarities are insufficient to overcome the many material differences. The evidence proffered by Defendant Fleming does not support "a close familial relationship and joint occupation to constitute a household." *Schratwieser*, 44 Conn. App. at 758.

Defendant Fleming next raises *Israel v. State Farm Mut. Auto. Ins. Co.*, 239 F.3d 127 (2d Cir. 2000).   There, the Second Circuit affirmed the district court's ruling on summary judgment that the plaintiff resided in the covered home because he "spent about two-thirds of his time" there over a two year period, and at the home he "had his own room, cooked his own meals, kept about half of his clothes, a computer and various files, did chores and maintenance work and garaged a car that he owned." *Id*. at 131-32.  The plaintiff also "received some of his mail at the [home]," and when his wife visited him in Connecticut, she stayed with him there. *Id*. at 132.  Once again, the only common facts between the present case and *Israel* are the Defendant's ability to access the home, receipt of mail, and the temporary storage of most, but not all, of his belongings at the House.  Further, there is no evidence that the Defendant had his own room, cooked any meals, or did any chores or maintenance work at the House.  Nor is there any evidence that he had permission to or did have any guests at the home.

IV.     <u>Conclusion</u>

For the foregoing reasons, the Court GRANTS Plaintiff GEICO's Motion for

Summary Judgment in its entirety.  The Clerk is directed to close this file.

IT IS SO ORDERED, ADJUDGED AND DECREED, this 6th day of January

2016, Hartford, Connecticut.

_____/s/_____
Vanessa L. Bryant,
United States District Judge
